1

2

3

4

5

6                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
7                                    AT SEATTLE

8    LE'TAXIONE X,                          )
                                            )
9                    Plaintiff,             )        CASE NO.      C08-1430-MJP-JPD
                                            )
10          v.                              )
                                            )
11   CORRECTIONS OFFICER ROCHON,            )        REPORT AND RECOMMENDATION
     et al.,                                )
12                                          )
                     Defendants.            )
13   _____)

14                    INTRODUCTION AND SUMMARY CONCLUSION

15          Plaintiff is a state prisoner who is currently incarcerated at the Clallam Bay Corrections

16   Center in Clallam Bay, Washington.  He brings this action under 42 U.S.C. § 1983 to allege

17   violations of his constitutional rights during the course of his incarceration at the Washington State

18   Reformatory ("WSR") from late 2005 to mid 2008, and at the Clallam Bay Corrections Center

19   ("CBCC") during the last half of 2008.  Plaintiff seeks declaratory and injunctive relief, and

20   damages.  Now pending before the Court are plaintiff's motion for partial summary judgment and

21   defendants' motion for summary judgment.  This Court, having reviewed the parties' motions, and

22   the balance of the record, concludes that defendants' motion for summary judgment should be

23   granted, plaintiff's motion for partial summary judgment should be denied, and plaintiff's

24   complaint, and this action, should be dismissed.

25

26   REPORT AND RECOMMENDATION
     PAGE - 1

1

BACKGROUND

2          Plaintiff filed the instant civil rights action in September 2008.  (Dkt. No. 1.)  In his

3     complaint, plaintiff identified sixteen defendants and alleged numerous causes of action.  (*See id.*)

4     Upon initial review of the complaint, the Court determined that plaintiff had adequately alleged a

5     cause of action against only nine of the sixteen named defendants.  Thus, the seven defendants

6     against whom plaintiff had not adequately alleged a cause of action were dismissed and service was

7     ordered on the remaining nine defendants.  (Dkt. No. 4.)  The service materials mailed to one of the

8     remaining nine defendants, Officer Nicholas, were returned to the Court as undeliverable because

9     Officer Nicholas was no longer employed at WSR at the time service was attempted.[1]  (*See* Dkt.

10    No. 9.)  As the Court does not have a current address for Officer Nicholas, he has not been served

11    and he is therefore not deemed a defendant in this action.  The eight remaining defendants are:

12    Corrections Officers Jeremiah Rochon and Daniel Engle; Intelligence and Investigation

13    investigators Bob Hoover, Jack Warner, and Bill Frantz; Correctional Sergeant Katy Autrey; Susan

14    Collins, an employee of the Administrative Segregation Hearings Office; and, Chaplain David

15    Duncan.

16          As to the eight remaining defendants, plaintiff alleges that his federal constitutional rights

17    were violated when:  (1) defendant Rochon shouted a racial epithet at plaintiff; (2) defendant

18    Hoover had plaintiff placed in administrative segregation for speaking of slavery during a religious

19    service; (3) defendant Autrey interfered with Ramadan prayer services; (4) defendants Warner and

20    Frantz divulged false information about plaintiff to other inmates thereby subjecting plaintiff to a

21    risk of harm by other inmates; (5) defendants Hoover, Frantz, and Warner denied him an

22    opportunity to obtain witness statements; (6) defendant Hoover confiscated legal papers which

23    _____

24          [1]  The service materials were mailed to Officer Nicholas at the Monroe Corrections
      Complex ("MCC").  WSR is one of the several units which make up MCC.

25

REPORT AND RECOMMENDATION

26    PAGE - 2

plaintiff had intended to file against employees at WSR; (7) defendant Engle attempted to shock plaintiff with a device which he had illegally introduced into WSR; (8) defendant Collins refused to process plaintiff's requests for witness statements in a timely manner; and, (9) defendant Duncan denied a request to rotate religious speakers at Al-Jumu'ah services and failed to provide members of the Nation of Islam with a religious group locker to store property at CBCC.  (*See* Dkt. No. 1.)

In September 2009, plaintiff filed a motion seeking summary judgment with respect to the following claims: (1) defendant Rochon used a racial epithet; (2) defendant Hoover improperly had him placed in administrative segregation and confiscated his legal materials; (3) defendant Warner implicated him as being involved in a security threat group; (4) defendant Engle illegally introduced a shocking apparatus into the institution with the intent to electrocute plaintiff; and, (5) defendant Autrey interfered with Ramadan prayer services.  (*See* Dkt. No. 46.)

In November 2009, defendants filed a motion for summary judgment and response to plaintiff's motion for summary judgment in which they sought summary judgment and dismissal of all of plaintiff's claims.  (Dkt. No. 54.)  Defendants argue therein that certain of plaintiff claims are unexhausted and that the remaining claims are without merit.  (*See id.*)  In December 2009, plaintiff filed a document which he identified as a motion for summary judgment and a response to defendants' motion for summary judgment.  (Dkt. No. 55.)  The Court construes that document as simply a response to defendants' summary judgment motion.  The briefing in this matter is complete and the parties' motions for summary judgment are now ripe for review.[2]

---

[2] Plaintiff's motion for partial summary judgment was originally noted on the Court's calendar for consideration on October 2, 2009.  That motion was stricken from the Court's calendar on November 19, 2009, to permit defendants' then anticipated motion for summary judgment and plaintiff's motion for partial summary judgment to be considered at the same time.  (*See* Dkt. No. 53.) .

REPORT AND RECOMMENDATION
PAGE - 3

1

<u>DISCUSSION</u>

2

Administrative Exhaustion

3        Defendants first argue in their motion for summary judgment that plaintiff failed to exhaust

4   his available administrative remedies with respect to certain claims asserted against defendants

5   Rochon, Engel, Warner, Frantz, and Hoover, and that those claims must therefore be dismissed.

6        Section 1997e(a) of Title 42 of the United States Code provides that "[n]o action shall be

7   brought with respect to prison conditions under section 1983 of this title, or any other Federal law,

8   by a prisoner confined in any jail, prison, or other correctional facility until such administrative

9   remedies as are available are exhausted." Section 1997e(a) requires *complete* exhaustion through

10  any available process. *See Porter v. Nussle* 534 U.S. 516, 524 (2002) ("All 'available' remedies

11  must now be exhausted."); *Booth v. Churner*, 532 U.S. 731, 735 (2001). Section 1997e(a) also

12  requires *proper* exhaustion. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper" exhaustion means

13  full compliance by a prisoner with all procedural requirements of an institution's grievance process.

14  *See id*. at 93-95. A prisoner who submits a complaint containing both exhausted and unexhausted

15  claims may proceed only with respect to the exhausted claims, and any unexhausted claims must be

16  dismissed. *See Jones v. Bock*, 549 U.S. 199, 219-223 (2007).

17       The Washington Department of Corrections ("DOC") has established an Offender

18  Grievance Program ("OGP") through which offenders may seek review of various aspects of their

19  incarceration. (*See* Dkt. No. 54-2 at 8-9.) The grievance procedure has four levels of review. (*Id*.

20  at 9.) The initial level, Level 0, is the complaint or informal level. (*Id*.) At this level, the grievance

21  coordinator receives a written complaint from an offender which identifies an issue with respect to

22  which the  offender wishes to pursue a formal grievance. (*Id*.) The grievance coordinator either

23  pursues informal resolution, returns the complaint to the offender for rewriting or for additional

24  information, or accepts the complaint and processes it as a formal grievance. (Dkt. No. 54-2 at 9.)

25

26  REPORT AND RECOMMENDATION
    PAGE - 4

1   At the first step of the formal grievance process, Level I, an offender's grievance is reviewed, and

2   responded to, by the institution's grievance coordinator. (*See* Dkt. No. 54-2 at 9.) An offender who

3   is dissatisfied with the response received from the grievance coordinator may appeal that decision

4   to the superintendent of the institution. (*See id*.) This is known as Level II. (*Id*.) All staff conduct

5   grievances are initiated at this level. (*Id*.) An offender who is dissatisfied with the response

6   received from the superintendent may appeal that decision to DOC headquarters where the

7   grievances are re-investigated. (*Id*. at 10.) This is known as Level III.

8   ***1.       Defendant Rochon***

9           Plaintiff asserts that on December 23, 2005, defendant Rochon was walking past the

10   religious activity center at WSR where plaintiff was leading a Nation of Islam Al-Jumu'ah service,

11   when defendant Rochon shouted "shut the fuck up, nigger" through an open window thereby

12   subjecting plaintiff to verbal and slanderous abuse. (*See* Dkt. No. 1 at 5-6.) Defendants argue that

13   plaintiff failed to exhaust this claim because plaintiff never filed a grievance against defendant

14   Rochon for making this alleged comment. (Dkt. No. 54 at 12-13.) Plaintiff responds that he did, in

15   fact, exhaust his claim against defendant Rochon because he filed an official misconduct complaint

16   with the Secretary of DOC, Harold Clarke, which was investigated at Mr. Clarke's request by

17   Prison Administrator Ruben Cedeño. (*See* Dkt. No. 55 at 3.)

18           The record confirms that while plaintiff's allegations of staff misconduct would have been

19   grievable through the OGP, plaintiff elected to bypass that process and instead file a staff

20   misconduct complaint directly with the Secretary of DOC. (Dkt. No. 55-2 at 13.) Upon receipt of

21   the complaint at DOC headquarters, the matter was referred back to the institution for further

22   investigation. (*See* Dkt. No. 55-2 at 15-16.) Under the OGP, staff misconduct complaints are

23   initiated at Level II, the level at which review by the superintendent of the institution occurs. Thus,

24   when DOC headquarters referred of the matter back to the institution for investigation, it effectively

25

26   REPORT AND RECOMMENDATION
     PAGE - 5

1   placed plaintiff's complaint in the position it would have been in had plaintiff not bypassed the

2   OGP process.

3          It appears that institutional investigators were able to confirm that defendant Rochon made

4   the comment "shut the fuck up," but were unable to confirm that he made the comment "nigger."

5   (*See* Dkt. No. 55-2 at 22.)  It is not clear from the record what actions the institution ultimately

6   took, if any, as a result of these findings.  However, it does appear clear that plaintiff was

7   dissatisfied with the result of the institutional investigation.  Under the OGP, if plaintiff was

8   dissatisfied with the response received from the institution with respect to any type of grievance,

9   plaintiff would have been required to file a Level III appeal to DOC headquarters in order to

10  properly exhaust the claim.

11         Plaintiff offers no evidence that he pursued the grievance to the headquarters level after the

12  institutional investigation was concluded, nor does he offer any argument as to why he should be

13  relieved of that obligation simply because he initiated his complaint at the headquarters level in the

14  first instance.  Because plaintiff fails to demonstrate that he provided DOC headquarters with an

15  opportunity to review the substance of his complaint after review was completed at the institutional

16  level, this Court concludes that plaintiff has not properly exhausted his claim against defendant

17  Rochon and, thus, the claim should be dismissed without prejudice.[3]

18

19

20         [3] Should the district court conclude that plaintiff did adequately exhaust his administrative

21  remedies with respect to his claim against defendant Rochon, this Court recommends, in the
    alternative, that the district court dismiss the claim with prejudice based upon plaintiff's failure to

22  state a claim upon which relief can be granted.  Even assuming defendant Rochon made the
    comment alleged by plaintiff, such conduct does not rise to the level of a constitutional violation.

23  The Ninth Circuit has held that verbal harassment or abuse is not sufficient to state a claim under
    § 1983.  *Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997) (citing *Oltarzewski v. Ruggiero*, 830

24  F.2d 136, 139 (9th Cir. 1987).  Thus, defendant Rochon's comment, although offensive, does not by
    itself implicate federal constitutional concerns.

25

    REPORT AND RECOMMENDATION
26  PAGE - 6

1

### 2.     Defendant Engle

2      Plaintiff asserts that on August 21, 2006, defendant Engle introduced a "shocking

3   apparatus" into the institution with the intent to electrocute plaintiff.  (*See* Dkt. No. 1 at 6, 7 and 9.)

4   Defendants argue that plaintiff failed to exhaust this claim because, though he filed a grievance

5   regarding this issue, he withdrew the grievance following his appeal to Level II because he was

6   satisfied with the corrective action taken by defendant Engel's superior.  (Dkt. No. 54 at 13.)

7   Plaintiff disputes defendants' assertion that he withdrew the grievance and he has presented

8   documentation which indicates that he did, in fact, appeal this issue all the way through Level III.

9   (*See* Dkt. No. 55-2 at 36-37.)  Accordingly, this Court concludes that plaintiff's claim against

10  defendant Engle has been exhausted and should be permitted to proceed.

11  ### 3.     Defendants Warner and Frantz

12     Plaintiff asserts that defendants Warner and Frantz divulged false information regarding

13  plaintiff to other inmates which exposed plaintiff to the risk of harm at the hands of other inmates.

14  More specifically, plaintiff contends that following an interracial fight in August 2007,

15  approximately six inmates were taken to administrative segregation where they were told by

16  defendant Warner that the Intelligence and Investigations ("I&I") staff "wanted the plaintiff and

17  they were going to get him in the hole."  (Dkt. No. 1 at 6.)  Plaintiff contends that defendant

18  Warner's actions implicated him as being involved in a security threat group and thereby

19  jeopardized his safety.  (*Id*.)  Plaintiff further contends that following a May 2008 incident where

20  three inmates assaulted two other inmates in the weight room at WSR, and again following a June

21  2008 interracial fight, defendant Frantz told the inmates involved in those incidents that plaintiff

22  was responsible for orchestrating those incidents and thereby jeopardized plaintiff's safety.  (*Id*. at

23  7.)

24     Defendants assert that plaintiff failed to exhaust these claims because he never filed any

25

26  REPORT AND RECOMMENDATION
    PAGE - 7

1    grievances against defendants Warner and Frantz regarding comments which plaintiff believed

2    compromised his safety.  (Dkt. No. 54 at 13.)  Plaintiff argues that these claims are exhausted

3    because he filed an official staff misconduct complaint with the Secretary of DOC in June 2008,

4    and the complaint was investigated at the Secretary's request.[4]

5          Plaintiff has provided the Court with a copy of the letter directed to the Secretary of DOC

6    on June 8, 2008, in which he complained of the actions of defendants Warner and Frantz.  (*See* Dkt.

7    No. 55-2 at 64.)  However, there is no other documentation in the record suggesting how, if at all,

8    this matter was addressed by DOC.  The OGP provided plaintiff an established procedure through

9    which he could have had his staff misconduct complaint heard.  Once again, however, plaintiff

10   opted to circumvent that procedure and apply directly to DOC headquarters for relief.  Because

11   plaintiff clearly did not comply with the procedural requirements of the OGP, and because there is

12   nothing in the record to suggest that plaintiff's staff misconduct complaint was substantively

13   reviewed at both the institutional and headquarters levels, this Court concludes that his claims

14   regarding comments of defendants Warner and Frantz which he believed compromised his safety

15   were not properly exhausted and must therefore be dismissed without prejudice.[5]

16   _____

17      [4]  This assertion actually contradicts one made by plaintiff in his complaint where, in
     reference to his June 2008 official staff misconduct complaint, he claims that the complaint was
18   forwarded to another headquarters official to be investigated, but that that individual refused to
     investigate.  (*See* Dkt. No. 1 at 7, paragraph 28.)

19      [5]  Should the district court conclude that plaintiff did adequately exhaust his claims
20   regarding comments made by defendants Warner and Frantz which plaintiff believed compromised
     his safety, this Court recommends, in the alternative, that the district court conclude that plaintiff
21   has not established an Eighth Amendment violation against either of these defendants.  While
     plaintiff complains that he was exposed to a risk of harm as a result of the alleged comments of
22   defendants Warner and Frantz, he admits that he never actually suffered any harm as a result of the
     comments.  (Dkt. No. 54-3 at 17-18.)  Thus, the deprivation complained of by plaintiff cannot be
23   deemed sufficiently serious to implicate Eighth Amendment concerns.  *See Farmer v. Brennan*, 511
     U.S. 825, 834 (1994) (the Eighth Amendment standard requires proof that (1) the alleged
24   wrongdoing was objectively "harmful enough" to establish a constitutional violation; and (2) the
     prison official acted with a sufficiently culpable state of mind).
25

26   REPORT AND RECOMMENDATION
     PAGE - 8

1    *4.    Defendant Hoover*

2          Plaintiff asserts that defendant Hoover confiscated his legal paperwork while he was

3    confined in administrative segregation from February 23, 2006, to March 14, 2006. (*See* Dkt. No. 1

4    at 6 and 9.)  Defendants argue that plaintiff failed to exhaust this claim because, while plaintiff filed

5    a grievance about not being provided with his legal work or his personal phonebook while in

6    segregation, he did not file a grievance about defendant Hoover taking any of his legal work. (Dkt.

7    No. 54 at 13.)  Plaintiff argues that he exhausted this claim through the grievance referenced by

8    defendants. (*See* Dkt. No. 55 at 10.)

9          The record reflects that plaintiff filed an initial grievance on March 4, 2006, in which he

10   complained that he had not received his legal work or his personal phonebook which he had

11   apparently requested when he was brought to the segregation unit on February 23, 2006. (Dkt. No.

12   54-2 at 46.)  He requested that his legal work and his phonebook be provided. (*Id.*)  In appears that

13   staff, in response to this grievance, looked for, but could not locate, the specific documents

14   requested by plaintiff. (*See id*. at 48.)  At Level II of the grievance process, plaintiff indicated that

15   I&I had "relinquished" some of his legal work, but that he did not yet have all of it and that what he

16   had received had been opened and affidavits were missing. (*Id.*)  Plaintiff requested that I&I

17   "relinquish" the rest of his legal work including the missing affidavits. (*Id.*)  The superintendent's

18   response to the Level II appeal was that all of plaintiff's property had been returned to him upon his

19   release to general population. (*Id.*)  At Level III, plaintiff complained that he was still missing three

20   affidavits from the legal work he had asked for while he was in administrative segregation and he

21   requested that I&I be asked "if it mistakenly misplaced any affidavits from my requested legal work

22   that was in their possession from 2-23-06 - 3-14-06 because there are (3) missing." (Dkt. No. 54-2

23   at 47.)

24          While plaintiff did not specifically assert during the grievance process that defendant

25

26   REPORT AND RECOMMENDATION
     PAGE - 9

1    Hoover confiscated his legal materials, plaintiff clearly sought to recover materials which he

2    believed had been removed from his property by the I&I staff, of which defendant Hoover was a

3    member.  Thus, this Court concludes that plaintiff's claim regarding confiscation of his legal

4    materials has arguably been exhausted and should be permitted to proceed.

5                                    Summary Judgment Standard

6            Summary judgment is proper only where "the pleadings, depositions, answers to

7    interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

8    genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

9    law." Fed.R.Civ.P. 56(c).  The moving party has the burden of demonstrating the absence of a

10   genuine issue of material fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

11   Genuine disputes are those for which the evidence is such that a "reasonable jury could return a

12   verdict for the nonmoving party."  *Id.*  Material facts are those which might affect the outcome of

13   the suit under governing law.  *Id.*

14           In response to a properly supported summary judgment motion, the nonmoving party may

15   not rest upon mere allegations or denials in the pleadings, but must set forth specific facts

16   demonstrating a genuine issue of fact for trial and produce evidence sufficient to establish the

17   existence of the elements essential to his case.  *See* Fed. R. Civ. P. 56(e).  A mere scintilla of

18   evidence is insufficient to create a factual dispute.  *See Anderson*, 477 U.S. at 252.  In ruling on a

19   motion for summary judgment, the court is required to draw all inferences in a light most favorable

20   to the non-moving party.  *Id.* at 248.  The court may not weigh the evidence or make credibility

21   determinations.  *Id.*

22                                      Section 1983 Standard

23           In order to sustain a cause of action under 42 U.S.C. §1983, a plaintiff must show (i) that he

24   suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that

25

26   REPORT AND RECOMMENDATION
     PAGE - 10

1  the violation was proximately caused by a person acting under color of state law.  *See Crumpton v.*

2  *Gates*, 947 F.2d 1418, 1420 (9ᵗʰ Cir. 1991).  The causation requirement of § 1983 is satisfied only if

3  a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative

4  act, or omitted to perform an act which he was legally required to do that caused the deprivation

5  complained of.  *Arnold v. IBM*, 637 F.2d 1350, 1355 (9ᵗʰ Cir. 1981) (quoting *Johnson v. Duffy*, 588

6  F.2d 740, 743-44 (9th Cir. 1978)).

7  **1.   *Defendant Hoover***

8         Plaintiff asserts that defendant Hoover violated his constitutional rights when he had

9  plaintiff placed in administrative segregation in February 2006 for speaking about slavery during a

10  religious service he was leading.  (*See* Dkt. No. 1 at 8.)  Plaintiff further asserts that defendant

11  Hoover read and confiscated his legal materials while he was in administrative segregation in

12  February 2006.  (*See id*. at 9.)  Plaintiff appears to contend that the confiscated materials were to be

13  filed against WSR employees at the Monroe Correctional Complex and that defendant Hoover's

14  alleged interference with those materials violated his right of access to the courts.  (*See id*.)

15         a.     *February 2006 Administrative Segregation Placement*

16         Defendant Hoover is the Chief Investigator for the Intelligence and Investigation Office at

17  WSR.  (*See* Dkt. No. 54 at 6; Dkt. No. 54-3 at 28.)  He has submitted a declaration in support of

18  defendants' summary judgment motion in which he states that he did not make the decision to place

19  plaintiff in segregation nor was he involved in the decision process which resulted in plaintiff's

20  placement in segregation.  (Dkt. No. 54-3 at 28.)  Plaintiff, in his response to defendants' summary

21  judgment motion, challenges defendant Hoover's assertion that he had nothing to do with the

22  placement and contends that defendant Hoover conspired with others to place him in segregation in

23  retaliation for plaintiff's exercise of his free speech rights.  (Dkt. No. 55 at 9.)  Plaintiff contends

24  that copies of e-mail messages which he submitted with his response support his contentions.  (*Id*.)

25

26  REPORT AND RECOMMENDATION
    PAGE - 11

1    The record reflects that plaintiff was referred to administrative segregation on February 23,

2    2006, "pending investigation by I&I into alleged deragatory [sic] racial/ethnic remarks."  (Dkt. No.

3    55-2 at 59.)  Though not entirely clear, it appears that plaintiff's administrative segregation

4    placement was related to comments he made during a Nation of Islam service on February 10,

5    2006.  (*See id*. at 60.)  The e-mail messages submitted by plaintiff reflect that Chaplain Supervisor

6    David Sherman observed the Nation of Islam service on that date and had concerns about

7    comments plaintiff had made about other religious and racial groups.  (*Id*. at 56.)  The e-mails also

8    reflect that there was a broader concern among WSR staff members, including defendant Hoover,

9    about what they perceived to be growing threats to staff and other inmates arising out of plaintiff's

10   activities within the Nation of Islam.  (*See id*. at 55-58.)  However, nothing in the e-mails submitted

11   by plaintiff demonstrates that defendant Hoover made the decision to place plaintiff in

12   administrative segregation in February 2006.  At most, the e-mails demonstrate that defendant

13   Hoover, in his role as an investigator with I&I, participated in an investigation into plaintiff's

14   activities which preceded his placement in administrative segregation.[6]

15   Even assuming defendant Hoover bears some responsibility for plaintiff's February 2006

16   administrative segregation placement, plaintiff has not demonstrated that the placement violated his

17   constitutional rights.  In order to prevail on a retaliation claim under § 1983, a plaintiff must show

18   he was retaliated against for exercising his constitutional rights, that the retaliatory action chilled

19   the exercise of his First Amendment rights, and that the retaliatory action did not advance

20   _____

21       [6]  Though not mentioned specifically by any of the parties in their briefing, the Court finds it
     noteworthy that when plaintiff originally filed his complaint in September 2008, he attached to it a

22   copy of letter, identified by plaintiff as an official misconduct complaint, which he had sent to the
     Secretary of DOC on February 23, 2006, the date of his administrative segregation placement, in

23   which he complained that the placement was "another retaliatory act perpetuated by Lt. Conner."
     (*See* Dkt. No. 1-2 at 35.)  In that letter, plaintiff explained that it was Lt. Conner who signed off on

24   the administrative segregation placement and he attributed Lt. Conner's actions to the fact that Lt.
     Conner had been the subject of previous complaints made by members of the Nation of Islam.  (*Id*.)

25

26   REPORT AND RECOMMENDATION
     PAGE - 12

1  legitimate penological goals, such as preserving institutional order and discipline.  *Rhodes v.*

2  *Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir.

3  2000); *Barnett v. Centoni.* 31 F.3d 813, 816 (9th Cir. 1994).  Thus, in order to survive summary

4  judgment, the plaintiff bears the burden of showing that there was no legitimate penological

5  objective to defendant's actions.  *See Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir. 1995).  The Court

6  evaluates a retaliation claim in light of the deference accorded prison officials.  *Id.* at 807.

7  Plaintiff makes no showing that defendants' actions did not advance legitimate penological

8  goals, such as preserving institutional order and discipline.  *See Pratt*, 65 F.3d at 806 ("The plaintiff

9  bears the burden of pleading and proving the absence of legitimate correctional goals for the

10  conduct of which he complains.")  In fact, plaintiff's own exhibits demonstrate that institutional

11  staff heard plaintiff making what they believed were derogatory statements regarding other races

12  and religions, and witnessed behavior they believed was creating disruptions within the living units.

13  (*See* Dkt. No. 55-2 at 55-58.)  As plaintiff was viewed as posing a threat to the orderly operation of

14  the facility, it was within the discretion of corrections officials to place him into administrative

15  segregation to investigate that potential threat.  Accordingly, defendants are entitled to summary

16  judgment with respect to plaintiff's claim that his February 2006 transfer to administrative

17  segregation was retaliatory in nature.

18       *b.*    *Access to Courts*

19  Defendant Hoover states in his declaration in support of defendants' summary judgment

20  motion that plaintiff requested certain legal materials while in segregation in February 2006 and

21  that he assisted WSR Grievance Coordinator Sue Collins in looking through plaintiff's property for

22  the requested materials.  (Dkt. No. 54-3 at 29.)  According to defendant Hoover, he scanned the

23  documents that appeared to be legal, as permitted by DOC policy, but did not find anything relevant

24  to plaintiff's request.  (*Id.*)  Defendant Hoover thereafter returned plaintiff's paperwork to the

25

26  REPORT AND RECOMMENDATION
    PAGE - 13

1  property sergeant.  Defendant Hoover denies that he retained, read, or in any way mishandled

2  plaintiff's legal paperwork.  (*Id*.)

3         At his deposition, plaintiff described the missing documents as a complaint, and supporting

4  documentation, that he was filing against Corrections Officer Rochon and "other people at Monroe"

5  regarding the incident in the chapel.  (Dkt. No. 54-3 at 20.)  Plaintiff stated that after the documents

6  were stolen, he got discouraged and he never got to file the complaint.  (*Id*.)  Plaintiff speculated

7  that it must have been defendant Hoover who was responsible for the missing documents because

8  he was the one who admitted to going through plaintiff's legal work.  (*Id*. at 22.)

9         Plaintiff offers no evidence, only speculation, to support his contention that defendant

10  Hoover was responsible for his missing legal work.  However, even assuming plaintiff could

11  establish that defendant Hoover was responsible for his missing papers, plaintiff had not alleged a

12  viable access to courts claim.

13         In *Bounds v. Smith*, 430 U.S. 817 (1977), the Supreme Court acknowledged that inmates

14  have a constitutional right of meaningful access to the courts premised on the due process clause.

15  *Id*. at 821.  The Supreme Court subsequently made clear that in order to adequately allege a cause

16  of action for deprivation of the right of access to the courts, an inmate must demonstrate that he

17  suffered some actual injury to his right of access.  *Lewis v. Casey*, 518 U.S. 343 (1996).

18          Given plaintiff's description of the documents which he claims were stolen and therefore

19  never filed, it appears, at most, that plaintiff had intended to earlier file a complaint raising issues

20  which he raises in the instant complaint.  As plaintiff did not lose his opportunity to pursue those

21  claims, there appears to have been no actual injury to plaintiff's right of access as a result of

22  defendant Hoover's alleged misconduct.  Accordingly,  defendants are entitled to summary

23  judgment with respect to plaintiff's access to courts claim.

24

25

1        ***2.        Defendant Autry***

2              Plaintiff asserts that defendant Autrey violated his right to free exercise of his religion when

3        she interfered with, and allowed outside distractions to interrupt, Ramadan services in September

4        2007.  More specifically, plaintiff asserts that on September 13, 2007, defendant Autrey ordered

5        that the door to the room where plaintiff's Ramadan prayer service was being held remain open

6        which caused plaintiff to break prayer because distractions from the secular world intruded and the

7        service was no longer considered sanctified or holy.  (Dkt. No. 1 at 7.)  Plaintiff contends that

8        defendant Autrey's order violated a logistics plan for Ramadan which was signed and approved by

9        defendant Autrey's superiors.[7]  (Dkt. No. 1 at 7)  Plaintiff further contends that he filed a grievance

10       complaining of defendant Autrey's actions and that defendant Autrey then retaliated against him by

11       filing a disciplinary infraction against him.  (*Id.*)

12             The First Amendment guarantees the right to the free exercise of religion.  In order to

13       establish a free exercise violation, a prisoner "must show the defendants burdened the practice of

14       his religion, by preventing him from engaging in conduct mandated by his faith, without any

15       justification reasonably related to legitimate penological interests."  *Freeman v. Arpaio*, 125 F.3d

16       732, 736 (9th Cir. 1997)(citing *Turner v. Safley*,  482 U.S. 78, 89 (1987)).  As the Ninth Circuit

17       explained in *Freeman*, "[i]n order to reach the level of a constitutional violation, the interference

18       with one's practice of religion 'must be more than an inconvenience; the burden must be substantial

19       and an interference with a tenet or belief that is central to religious doctrine.'"  *Id*. at 737 (quoting

20       _____

21              [7]  The approved logistics plan for Ramadan 2007 contained the following provision:

22              After finishing their meal, inmates are escorted to the C/D Dayroom [sic], TV Room,
                Barber shop [sic] for prayer and return to living units afterwards.  Every effort will
23              be made to maintain noise including doors needed because of worship nature of this
                prayer time.

24
         (Dtk. No. 55-2 at 51.)
25
         REPORT AND RECOMMENDATION
26       PAGE - 15

1    *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir. 1987)).

2           Defendant Autrey is a corrections sergeant.  She has submitted a declaration in support of

3    defendants' summary judgment motion in which she explains that there is a television room located

4    in the day room area of the living unit which she supervises at WSR which the Nation of Islam uses

5    once a year during the month of Ramadan.  (Dkt. No. 54-3 at 25.)  According to defendant Autrey,

6    the room is enclosed with a door which has a window in the top 1/3 of it, and that for security

7    purposes the door is to remain open regardless of who is using the room.  (*Id.*)

8           Defendant Autrey states that she was on duty on September 13, 2007, and that she spoke to

9    the shift lieutenant that day regarding the door to the television room because plaintiff wanted the

10   door closed during the Nation of Islam services.  (Dkt. No. 54-3 at 25.)  According to defendant

11   Autrey, the shift lieutenant reiterated that the door was to remain open because of security issues

12   and, thus, defendant Autrey instructed the corrections officers working in the day room area that the

13   door to the television room was to remain open at all times.  (*Id*. at 25-26.)

14          The following day, September 14, 2007, offenders participating in the Nation of Islam

15   Ramadan prayer service again closed the door to the television room and a different officer, Officer

16   Kersten, required that the door remain open in accordance with orders he had received.  (*Id*. at 26.)

17   Defendant Autrey states that plaintiff then led the other offenders participating in the prayer service

18   out of the television room and into the day room where he "led a verbal demonstration protesting

19   the action" and then returned with the group into the television room.  (*Id.*)  Plaintiff was

20   subsequently charged with, and found guilty of, violating prison rules against unauthorized group

21   demonstrations and using intimidation against staff.  (*Id.*)

22          Defendant Autrey denies that there was any intent to discriminate against any group or

23   individual and states that she enforces the open door policy for the television room for any group

24   using the room.  (*Id.*)

25
     REPORT AND RECOMMENDATION
26   PAGE - 16

1      Plaintiff contends that defendant Autrey's description of the room is misleading because the

2   television room has see-through plexiglass windows all the way around which allows occupants to

3   be viewed from the waist up.  (Dkt. No. 55 at 9.)  Plaintiff suggests that the portion of the logistics

4   plan which stated that "every effort will be made to maintain noise including door needed because

5   of worship nature of this prayer time" was approved because the occupants of the room could be

6   readily seen through the plexiglass windows.  (Dkt. No. 55 at 9.)

7      Defendants argue that the logistics plan did not actually permit the door to the television

8   room to remain closed during the Nation of Islam Ramadan services and that plaintiff admitted as

9   much in his deposition when he confirmed that the plan really only said that all attempts to ensure

10  privacy would be made.  (Dkt. No. 54 at 15.)  In fact, plaintiff stated at his deposition that he did

11  not know what the plan stated verbatim.  (Dkt. No. 54-3 at 11.)  The logistics plan is somewhat

12  unclear on the issue of whether the doors were to remain closed during Ramadan prayer services.

13  However, the Court need not resolve the question of whether or not the logistics plan was violated

14  in order to resolve the constitutional issue.

15     The question this Court must answer is whether defendant Autrey's insistence that the door

16  to the day room remain open during the Ramadan prayer service on two days during the month of

17  Ramadan violated plaintiff's right to the free exercise of his religion.  Plaintiff makes no such

18  showing.  While plaintiff assigns an improper motive to defendant Autrey's order that the door

19  remain open, it appears that the order was executed at the direction of her superior and that the

20  decision was based upon security concerns.  Institutional security has been recognized as a valid

21  penological objective which justifies the limitation of certain rights and privileges.  *See O'Lone v.*

22  *Estate of Shabazz*, 482 U.S. 342, 348 (1987).  And, even assuming that the closing of the door on

23  September 13 and 14 could be deemed an interference with plaintiff's ability to practice his

24  religion, the facts do not support the conclusion that such interference constituted a substantial

25

26  REPORT AND RECOMMENDATION
    PAGE - 17

1   burden.  Thus, plaintiff's claim that defendant Autrey violated his right to free exercise of his

2   religion must fail.

3        To the extent plaintiff claims that the infraction he received on September 14, 2008, was

4   issued in retaliation for him filing a grievance against defendant Autrey on the preceding day,

5   plaintiff's claim also fails because the claim is conclusory and is not supported by any evidence in

6   the record.

7        For the foregoing reason, defendants are entitled to summary judgment with respect to all

8   claims asserted against defendant Autrey.

9   **3.    *Defendant Engle***

10       Plaintiff alleges that defendant Engle illegally introduced into WSR a "shocking apparatus"

11  with the intent to electrocute plaintiff and that this conduct violated plaintiff's rights under the

12  Eighth Amendment.  (Dkt. No. 1 at 9.)

13       The Eighth Amendment imposes a duty upon prison officials to provide humane conditions

14  of confinement.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  This duty includes taking

15  reasonable measures to guarantee the safety of inmates.  *Farmer*, 511 at 832.  In order to establish

16  an Eighth Amendment violation, a prisoner must satisfy a two-part test containing both an objective

17  and a subjective component.  The Eighth Amendment standard requires proof that (1) the alleged

18  wrongdoing was objectively "harmful enough" to establish a constitutional violation; and (2) the

19  prison official acted with a sufficiently culpable state of mind. *Id*. at 834.

20       The objective component of an Eighth Amendment claim is "contextual and responsive to

21  'contemporary standards of decency'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)(quoting *Estelle v.*

22  *Gamble*, 429 U.S. 97, 103 (1976)).  The state of mind requirement under the subjective component

23  of the Eighth Amendment standard has been defined as "deliberate indifference" to an inmate's

24  health or safety.  *Farmer*, 511 U.S. at 834.

25

26  REPORT AND RECOMMENDATION
    PAGE - 18

1     Defendant Engle is a corrections officer at WSR.  He has submitted a declaration in support

2  of defendants' motion for summary judgment in which he explains that he brought a novelty toy in

3  to work on August 18, 2008.  (Dkt. No. 54-2 at 54.)  He states that the toy was not sophisticated in

4  any way and was the kind of toy that could be purchased at a convenience or value store.  (*Id*.)  He

5  describes the toy as one that resembled a flashlight, but delivered a mild shock to the person

6  holding the toy when the button was pushed.  (*Id*.)  Defendant Engle states that he brought the toy

7  in to work for entertainment purposes, believing that it might help build rapport with the inmates.

8  (*Id*. at 54-55.)  Thus, when inmates asked to see the toy, he allowed them to handle it.  (*Id*. at 55.)

9  According to defendant Engle, it was common knowledge among the group that the toy was meant

10  to deliver a mild shock if the button was pushed.  (*Id*.)  Defendant Engle recalls that plaintiff was

11  among the group of inmates who asked to see the toy.  (*Id*.)

12     Defendant Engle denies that he required anyone to take the toy and states that those who

13  handled it did so voluntarily.  (*Id*.)  Defendant Engle also states that by the time the toy had been

14  handed around several times it had been dropped on the concrete floor and no longer delivered any

15  shock.  (*Id*.)  According to defendant Engle, plaintiff was never shocked by the device.  (*Id*.)

16     Plaintiff asserts in his motion for partial summary judgment that defendant Engle knowingly

17  and intentionally shocked him with the device.  (Dkt. No. 46-2 at 12.)  However, plaintiff admitted

18  at his deposition that he was never shocked by the device because it malfunctioned.  (Dkt. No. 54-3

19  at 12.)  Plaintiff denied though that defendant Engle ever told him prior to handing him the device

20  that it was supposed to deliver a shock.  (*Id*.)

21     To the extent there is a factual dispute with respect to plaintiff's Eighth Amendment claim

22  against defendant Engle, it goes to whether defendant Engle intended to cause plaintiff any harm.

23  There is no dispute, however, that plaintiff suffered no harm.  Accordingly, plaintiff has not

24  established any violation of his Eighth Amendment rights arising out of the incident regarding

25

26  REPORT AND RECOMMENDATION
     PAGE - 19

1    defendant Engle and the toy flashlight.  Defendants are therefore entitled to summary judgment

2    with respect to this claim.

3    ***4.       Defendant Collins***

4            Plaintiff asserts that after he was placed in administrative segregation on July 3, 2008, for

5    investigation of his role in an inmate on inmate assault and an interracial fight, both of which

6    occurred in June 2008, defendant Collins refused to process his requests for witness statements in a

7    timely manner and thereby precluded him from mounting a defense to the allegations which

8    resulted in his administrative segregation placement.

9            Defendant Collins works in the Administrative Segregation Hearings Office at WSR.  (Dkt.

10   No. 54-3 at 31.)  She has submitted a declaration in support of defendants' summary judgment

11   motion in which she explains that when an inmate is placed in segregation, he is served with a

12   hearing notice/appearance waiver form.  (*Id*.)  When plaintiff was served with this notice, he

13   provided staff with a request for witness statements.  (*Id*.)  According to defendant Collins,

14   plaintiff's request was received late in the day on July 3, 2008.  (*Id*.)  The following day was both a

15   Friday and a holiday.  (*Id*.)  The administrative segregation administrative staff does not work

16   weekends or holidays and those days are therefore excluded from time frames for processing

17   hearings and witness statements.  (*Id*. at 32.)

18           On Monday, July 7, 2008, plaintiff's request for witness statements was processed with

19   requests for staff witness statements being sent electronically and requests for offender statements

20   being sent via the institutional mail system.  (*Id*.)  Defendant Collins states that plaintiff was

21   provided copies of all requests that were made and was informed on July 7, 2008, that there were

22   some witness statements that could not be processed because he had failed to adequately identify

23   the individual from whom he was seeking the statement.  (*Id*.)  The review of plaintiff's

24   administrative segregation placement occurred on July 8, 2008.  (*Id*.)  At that time, plaintiff

25

26   REPORT AND RECOMMENDATION
     PAGE - 20

indicated that he could not proceed with the hearing because he did not have his witness statements and he believed there was some sort of discrepancy in the administrative hearing waiver.  (*Id*.) Plaintiff was advised at that time that all requests that could be sent out had been and that all responses would be forwarded to him upon their receipt in the administrative segregation office. (Dkt. No. 54-3 at 32)

On July 10, 2008, plaintiff filed additional requests for witness statements and those requests were processed the same day they were received.  (*Id*.)  As responses to those requests were received, they were processed and forwarded to plaintiff.  (*Id*.)  According to defendant Collins, plaintiff made multiple requests for statements from other offenders during his time in segregation and each time the requests were processed and sent out to the specified individuals. (*Id*.)  Defendant Collins states that there were many offenders who did not respond to plaintiff's requests and, thus, there was nothing to forward to plaintiff.  (*Id*.)

Plaintiff, in his response to defendants' summary judgment motion, does not respond in any fashion to defendant Collins' statements.  In fact, the record is largely silent on the issue of the witness statements aside from the relatively conclusory allegations made by plaintiff in his complaint.  Plaintiff was queried about the witness statements during his deposition, but plaintiff's testimony did little to clarify the issue.  (*See id*. at 13-16.)  While Plaintiff stated that he was not getting witness statements back in time to use them, he offers no evidence to support his contention that defendant Collins refused to timely process his requests for witnesses statements or that she in any way interfered with his ability to defend against the allegations which resulted in his placement in administrative segregation in July 2008.  Accordingly, defendants are entitled to summary judgment with respect to plaintiff's claims against defendant Collins.[8]

---

[8] Plaintiff also alleges that defendants Hoover, Frantz, and Warner prevented him from obtaining witness statements.  However, the allegation are conclusory at best and do not warrant further consideration.

REPORT AND RECOMMENDATION
PAGE - 21

1    **5.    *Defendant Duncan***

2          Plaintiff alleges that defendant Duncan denied a request to rotate religious speakers at the

3    weekly Al-Jumu'ah prayer services at CBCC and refused to provide members of the Nation of

4    Islam with a locker to store their religious group property.  (Dkt. No. 1 at 9-10.)  Plaintiff asserts

5    that defendant Duncan's actions had the effect of endorsing one Islamic doctrine over another and

6    placed a substantial burden on his right to free exercise of his religion.  (*Id*.)

7          This claim, as set forth in plaintiff's complaint, is not particularly clear.  However,

8    defendant Duncan has submitted a declaration in support of defendants' motion for summary

9    judgment which provides some context for the claim.  (Dkt. No. 54-3 at 41-42.)  Defendant Duncan

10   is the chaplain at CBCC.  (*Id*. at 41.)  He states that he met plaintiff in late July 2008, shortly after

11   plaintiff's arrival at CBCC, when he gave a presentation regarding access to religious programing,

12   diets, and property.  (*Id*.)  According to defendant Duncan, plaintiff asked him at that time how the

13   Muslim religious service, Jumah, worked.  (*Id*.)  Plaintiff wanted to know if the lecture or sermon,

14   the Khutbah, was rotated among the various groups within the Muslim faith; *i.e.*, Shiite, Sunni, and

15   Nation of Islam.  (*Id*.)  Defendant Duncan explains that at that time, there was a single Jumah

16   service and the Khutbah was given by the offender Imam.  (*Id*. at 42.)  Plaintiff made a request that

17   the Khutbah be rotated.  (*See id*.)

18         Defendant Duncan spoke to the Religious Program Manager for the DOC about plaintiff's

19   request.  (*Id*.)  That individual checked with other state prisons as well as the Religious Advisory

20   Committee, a group of volunteers and leaders of various faiths, and it was determined that there

21   were significant enough differences in the doctrines and beliefs of the various group of the Muslim

22   faith that the Nation of Islam could have its own Jumah and study group.  (*Id*.)  Defendant Duncan

23   states that the first Jumah for the Nation of Islam was on September 26, 2008, and they have been

24   held weekly since that time.  (*Id*.)  The Nation of Islam also has a two hour study group on

25

26   REPORT AND RECOMMENDATION
     PAGE - 22

1    Thursdays and they were provided locker space to store their religious items just as with every

2    other religion. (*Id*)

3          Plaintiff indicated at his deposition that his preference would be that all Muslims at CBCC

4    have Al-Jumu'ah services together. (Dkt. No. 54-3 at 8.)  However, he offers no opposition to

5    defendants' motion for summary judgment on this issue, perhaps recognizing that the

6    accommodations made for the Nation of Islam Al-Jumu'ah service and study group as a result of

7    defendant Duncan's efforts moot his free exercise claim.  Defendants are entitled to summary

8    judgment with respect to plaintiff's claim against defendant Duncan.

9                                    CONCLUSION

10         For the reasons set forth above, this Court recommends that defendants' motion for

11   summary judgment be granted and that plaintiff's motion for partial summary judgment be denied,

12   This Court further recommends that plaintiff's complaint, and this action, be dismissed without

13   prejudice as to plaintiff claims that defendant Rochon used a racial epithet and that defendants

14   Warner and Franz made comments that compromised plaintiff's safety, and with prejudice as to all

15   remaining claims.  A proposed order accompanies this Report and Recommendation.

16         DATED this 9th day of April, 2010.

17         _____
           *James P. Donohue*

18         JAMES P. DONOHUE
           United States Magistrate Judge

19

20

21

22

23

24

25

26   REPORT AND RECOMMENDATION
     PAGE - 23